UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTWION R. JONES,

    Plaintiff,

v.

P. LAM, et al.,

    Defendants.

Case No. 19-cv-01602-SI

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 16, 17

## INTRODUCTION

Antwion Jones, an inmate at the Correctional Training Facility in Soledad, filed this *pro se* civil rights action under 42 U.S.C. § 1983. This action is now before the court for consideration of the motion for summary judgment filed by defendant Dr. Zewert and the motion for summary judgment filed by defendants Dr. Lam and Dr. Posson. Jones opposes both motions. For the reasons discussed below, summary judgment will be granted in defendants' favor.

## BACKGROUND

This action concerns the responses of three doctors to problems regarding Jones' left middle finger. Jones contends that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by their deliberate indifference to problems with his left middle finger.

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to this action occurred from October 2016 through December 2018. At the relevant time, Jones was a prisoner at the Correctional Training Facility (CTF) in Soledad, California.

Defendants P. Lam, M.D. and S. Posson, D.O, were on medical staff at CTF during the relevant time. Docket No. 15-3 at 1; Docket No. 15-4 at 1-2. Dr. Lam treated Jones for part of the relevant time. Docket No. 15-3 at 2. Dr. Posson is the Chief Medical Executive at CTF. Docket No. 15-4 at 1. Dr. Posson did not personally examine Jones; instead, his alleged liability stems from his role in reviewing Jones' medical care to respond to Jones' inmate appeal. Docket No. 15-4 at 2-4. Defendant T. Zewert, M.D., is a physician and surgeon who is board-certified in plastic surgery and has a private practice. Docket No. 17-4 at 1. Dr. Zewert has performed over 200 hand surgeries annually for the past 17 years. *Id.* at 6.

On October 30, 2016, Jones injured his right index finger and left middle finger during a flag football game. *See id.* at 13, 37. After this event, Jones sought medical care from Dr. Lam and Dr. Zewert for the injury to his right index finger. Docket No. 15-3 at 2; Docket No. 17-4 at 2. Dr. Zewert performed surgery on Jones' right finger on March 9, 2017, without complication.[1] Docket No. 17-4 at 2.

On December 4, 2016, Jones submitted a request for health care services regarding his left hand. Docket No. 18-1 at 4. On December 6, 2016, Dr. Lam ordered an x-ray of Jones' left hand for possible injury to his left middle and ring fingers. Docket No. 15-3 at 13. The x-ray was completed the same day. *Id.*

On June 1, 2017, Dr. Lam saw Jones for a follow-up examination of his right hand. Docket No. 15-3 at 2. During this visit, Dr. Lam noted a decreased range of motion in Jones' left middle finger between 45-90° at the proximal interphalangeal (PIP) joint, the middle joint of the finger. *Id.* According to Dr. Lam, this was the first indication of limited range of motion in Jones' left finger. *Id.* Dr. Lam ordered an x-ray of the left hand to examine the limited range of the finger. *Id.*; *see also id.* at 9.

Dr. Lam was transferred from CTF to a different facility in July 2017. *Id.* at 3.

---

[1] The care of Jones' right finger is not at issue in this case. The court only mentions the facts regarding the right finger for context.

2

According to Jones, he requested physical therapy and a second opinion from Dr. Lam on several unidentified dates, and Dr. Lam denied these requests due to cost restraints.[2] Docket No. 1 at 10.

Jones had a follow-up examination with another prison doctor (Dr. Kalisher) on July 27, 2017, after his left hand was x-rayed on June 6, 2017. Docket No. 15-3 at 7, 12. Dr. Kalisher noted that no fractures were found, showed Jones hand exercises, and requested a referral for a hand surgery consultation. *Id.* at 7-8.

Jones was seen by hand specialist Dr. Zewert on August 18, 2017, for the first time for the left finger injury. Docket No. 17-4 at 2. Dr. Zewert found that Jones was unable to move the finger's PIP joint and diagnosed him with a severe flexion contracture – apparently meaning that Jones middle finger was stuck in a closed or near-closed position – that had lasted a year. *Id.* He recommended Jones undergo surgery to repair the finger. *Id.* Dr. Zewert "believed that there was a reasonable, albeit low, chance to gain some function" in the left finger, but "the possibility that [Jones] would regain full function of the finger was minimal and unlikely." *Id.* at 2-3.

Dr. Zewert performed surgery on Jones' left middle finger on September 19, 2017. Docket No. 1 at 9; Docket No. 17-4 at 3. Prior to surgery, Mr. Jones signed a consent form in which he acknowledged awareness of the risk for infection. Docket No. 17-4 at 129. Also prior to surgery, Dr. Zewert examined Jones' range of motion and found a severe contracture of the left middle finger PIP joint and significant contractures of the two other joints in the finger. *Id.* at 3. Mr. Jones had almost no function of his finger. *Id.*

On September 27, 2017, Jones sought treatment from CTF medical staff for a possible infection of the left finger and was prescribed antibiotics. Docket No. 18 at 3; *see* Docket No. 17-4 at 3. According to Jones, an on-call physician saw him and prison medical staff contacted Dr. Zewert to notify him of the infection.[3] Docket No. 1 at 8, 9.

---

[2] Dr. Lam declares that he never denied Jones any appropriate and necessary medical care. Docket No. 15-3 at 3. At the summary judgment stage, this court must accept as true the non-movant's version of events and therefore accepts Jones' version.

[3] Dr. Zewert declares he first became aware of Jones' possible infection two days later during an appointment. Docket No. 17-4 at 3. At the summary judgment stage, this court must accept as

3

Two days later, on September 29, 2017, Jones saw Dr. Zewert for a post-operative follow-up appointment. Docket No. 17-4 at 3. Jones told Dr. Zewert that his splint became wet and he had left the wet dressing on his finger. *Id.* Dr. Zewert found an ischemic process[4] and a hematoma[5] on Jones' left finger. *Id.* Dr. Zewert drained the hematoma and examined the finger for infection. *Id.* Although he found no infection, Dr. Zewert recommended Jones continue taking his prescribed antibiotics (Bactrim and Keflex) because Jones was still at risk of infection due to the hardware in his finger, the ischemic process that was present, and the high risk of contamination from the splint that was prone to getting wet. *Id.* at 3-4. Dr. Zewert recommended daily dressing changes for Jones' finger until the next scheduled appointment on October 12, 2017. *Id.* at 4.

On October 7, 2017, Jones was sent from prison to the Natividad Medical Center, where the emergency room (E.R.) physician found the surgical volar skin flap on the finger "blackened and hardened. No active pus noted." *Id.* at 110. The E.R. physician contacted Dr. Zewert to discuss whether Jones' situation would require active intervention. *Id.* at 4. The E.R. physician told Dr. Zewert "that there appeared to be some blistering and seepage from the wound and the volar flap was blackened and hardened, but no active pus was noted." *Id.* The E.R. physician determined there was necrosis and noted a differential diagnosis of a possible infection. *Id.*; *see also id.* at 111. Dr. Zewert and the E.R. physician concluded there was no active, progressing infection and thus no need to operate or prescribe more aggressive antibiotics. *Id.* at 4. The E.R. doctor prescribed an additional antibiotic (Keflex) to the Bactrim Jones had been taking. *Id.* at 111.

Jones next saw Dr. Zewert on October 12, 2017. *Id.* at 4. An examination of Jones' finger revealed significant necrosis in multiple areas. *Id.* Dr. Zewert removed the dead tissue, washed the wound with saline several times, and sent a culture from the wound for testing. *Id.* at 5. He also

---

true the non-movant's version of events and therefore accepts Jones' version, i.e., that Dr. Zewert first learned of the infection on September 27 rather than on September 29.

[4] "Ischemia" is the "[l]ocal loss of blood supply due to…obstruction…of the blood vessel." *Stedman's Medical Dictionary* 1001 (28th ed. 2006).

[5] A "hematoma" is a "localized mass of extravasated blood that is relatively or completely confined within an organ or tissue…; the blood is usually clotted…and…may manifest various degrees of organization and decolorization." *Stedman's Medical Dictionary* 863 (28th ed. 2006).

4

removed a pin that had been inserted to stabilize the joint. *Id.* Dr. Zewert recommended Jones change the dressing on his finger twice a day and explained the need to keep the finger clean to avoid further contamination. *Id.*

On October 20, 2017, Jones again saw Dr. Zewert for pin removal. *Id.* at 11. Dr. Zewert found the infection was under control and there was no further necrosis. *Id.* at 5. Jones was instructed to continue changing his dressing daily and continue to take the prescribed antibiotics plus doxycycline as a precaution. *Id.*

On November 7, 2017, Dr. Zewert performed a skin graft on the wound. *Id.* Prior to the procedure, Jones signed a consent form indicating he was aware of the risk of infection. *Id.* at 127. At follow-up appointments on November 20, 2017, and December 1, 2017, Dr. Zewert determined that the skin graft was successful and the wound was healing well. *Id.* at 5.

When Jones saw Dr. Zewert on March 9, 2018, for another surgical consultation due to Jones' continued inability to move his left finger, Dr. Zewert mentioned the possibility of a finger reconstruction consisting of three additional surgeries. *Id.* Dr. Zewert explained that the surgeries would be risky and painful, take a year to accomplish, require extensive recovery, and have a low possibility of resulting in a normal finger. *Id.* at 5-6. Dr. Zewert also gave Jones the option of amputation at the PIP joint. *Id.* at 6. Jones requested a second opinion and Dr. Zewert submitted this request to prison officials. *Id.*

On June 26, 2018, Jones filed an inmate appeal, complaining that he had not received the physical therapy on his left finger that was recommended by an unidentified doctor or the second opinion that Jones had requested repeatedly. Docket No. 15-4 at 13.

Dr. Posson provided the Institutional Level Response to Jones' inmate appeal on August 31, 2018. *Id.* at 2. Registered nurse Perry interviewed Jones on August 8, 2018, and Jones was given the opportunity to explain his issues. *Id.* Dr. Posson reviewed Jones' health care records and the departmental policies and procedures. *Id.* Dr. Posson's written response stated that, with regard to the request for physical therapy, Jones' provider had documented that Jones was able to complete all his activities of daily living and write legibly, and that Jones had a scheduled appointment with his primary care physician to discuss his request for physical therapy and other treatment options

5

for the finger. Docket No. 15-4 at 15-16. Dr. Posson's response further stated that, with regard to Jones' desire for a second opinion, Jones' primary care provider had "discussed [Jones'] case with other orthopedic surgeons and concluded that a second opinion would likely not offer any improvement or better alternative to the current plan that has been established with [Jones'] hand specialist." *Id.* at 16. The records showed that the primary care physician had discussed this decision with Jones and continued Jones' follow-up visits. *Id.* Dr. Posson concluded that Jones should continue to follow his primary care physician's directions. *Id.* at 2-3. (Jones' inmate appeal later was denied at the Director's level. Docket No. 15-4 at 9.)

On December 21, 2018, Jones saw Dr. Zewert for a follow-up appointment. Docket No. 17-4 at 6. Dr. Zewert noted that Jones' finger was very stiff. *Id.* Dr. Zewert reiterated to Jones that reconstruction of Jones' finger would require three surgeries and have a low possibility of resulting in a normal finger. *Id.* Dr. Zewert also recommended a second opinion. *Id.* (There is no evidence that Dr. Zewert, an outside physician, had the authority to order a second opinion for an inmate.) This was the last interaction Dr. Zewert had with Jones. *Id.*

Dr. Zewert declares that he does not recall recommending or requesting physical therapy for Jones' finger. Docket No. 17-4 at 6. "In light of the circumstances, [Dr. Zewert] believe[d] that a physical therapist would not have helped him and could possibly have been a detriment." *Id.* Nonetheless, Jones eventually received physical therapy for his finger on January 4, 2019. Docket No. 18-1 at 15. An occupational therapy treatment note on February 6, 2019, from an unidentified source lists a different person as the "treating physician" and Dr. Zewert as the "referring physician." *Id.* at 11, 13.

Dr. Nathaniel Cohen, a board-certified orthopedic surgeon, provided an undisputed expert opinion "that all of the care and treatment provided by Dr. Zewert with regard to the plaintiff's left middle finger injury and the subsequent complications regarding the necrotic tissue and bacterial infection on the finger met the standard of care." Docket no. 17-3 at 6.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the complaint occurred in Monterey County, located in the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald,* 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification was not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Jones' complaint was signed under

penalty of perjury so the facts therein are considered as evidence for purposes of deciding the motion. *See* Docket No. 1 at 13.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id*. at 631.

**DISCUSSION**

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Defendants do not dispute that the evidence in the record suffices to allow a jury to conclude that Jones' problems with his left middle finger presented a serious medical need.

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or

8

it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" was sufficient to present a colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (affirming summary judgment for defendants because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, [an inmate] must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the inmate's] health.'" *Toguchi*, 391 F.3d at 1058.

A. <u>Dr. Lam</u>

Jones alleges in his verified complaint that Dr. Lam denied recommended post-surgery physical therapy and a second opinion, citing cost effectiveness. Docket No. 1 at 8, 10.

Having carefully reviewed the evidence, the court concludes that no reasonable jury could find that Dr. Lam's response to Jones' left finger care needs amounted to deliberate indifference. The evidence shows that in December 2016, Dr. Lam saw Jones two days after Jones sought services because his left hand "keep[s] cramping up between the bones." Docket No. 18-1 at 4. Dr. Lam promptly ordered an x-ray of Jones' left hand. There is no evidence that the x-ray revealed any problems. Several months later, Jones' left hand issues arose again and Dr. Lam noticed that Jones' left middle finger had a decreased range of motion. Dr. Lam again ordered an x-ray of the left hand. The x-ray showed no fractures. After the second x-ray, Dr. Lam was transferred to a different

facility in July 2017 and no longer treated Jones.

Although Jones claims that Dr. Lam denied him physical therapy and a medical second opinion based on cost effectiveness, Jones fails to provide evidence as to the dates on which his requests for physical therapy and a medical second opinion were made to Dr. Lam. According to the medical records before the court, Jones first requested treatment for his left hand on December 4, 2016, over a month after the initial injury, and his left hand issues did not arise again until June 2017. The medical records show that Dr. Lam ordered two x-rays for the left finger: one on December 6, 2016, in response to Jones' request for services, and another on June 1, 2017, upon learning of the limited range of motion in Jones' left finger. Dr. Lam's order of two x-rays undermines the view that he was driven solely by cost concerns when treating Jones, and instead tends to support the view that he acted to determine the underlying basis for the finger injury. There is no evidence that physical therapy was then medically necessary given the contracture in Jones' finger.

The evidence in the record also shows that Dr. Lam's treatment of Jones' left finger ended when Dr. Lam was transferred to another correctional facility after the June 1, 2017, appointment. Given Dr. Lam's specific statement that he did not provide care for Jones' finger after he was transferred to another facility in July 2017 (before the left finger surgery occurred) and the absence of any medical records reflecting that Jones saw Dr. Lam after the July 2017 transfer, Jones' vague statement that on some unidentified date Dr. Lam denied physical therapy and a second opinion fails to raise a triable issue that Dr. Lam dealt with him after the surgery. Moreover, Jones presents no evidence to show that Dr. Lam knew the results of the x-ray he had ordered on June 1, or understood the underlying problems with Jones' finger, before he was transferred and ended his role as Jones' doctor in July 2017.

Even assuming arguendo that Dr. Lam did deny Jones physical therapy and a second opinion, Jones has not presented any evidence that would allow a reasonable trier of fact to conclude that the denial was anything more than a non-actionable difference of opinion between patient and doctor as to the proper course of care. Jones has presented no evidence that would allow a reasonable jury to find that not arranging for physical therapy or a second opinion for Jones' left finger problem was

10

medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to Jones' health. *See Toguchi*, 391 F.3d at 1058.

B. <u>Dr. Posson</u>

Jones alleges in his verified complaint that Dr. Posson denied post-surgery physical therapy. Docket No. 1 at 9.[6]

Having carefully reviewed the evidence, the court concludes that no reasonable jury could find that Dr. Posson's response to Jones' left finger care needs amounted to deliberate indifference. Dr. Posson's role was limited to reviewing Jones' inmate appeal regarding the care he received for his left finger. The undisputed evidence shows that Dr. Posson's response to Jones' inmate appeal was based on a review of Jones' medical records as well as the interview Jones had with a nurse. Regarding Jones' physical therapy argument, Dr. Posson found that the medical records indicated Jones was able to complete his activities of daily living and write legibly, and that Jones had an upcoming appointment with his primary care provider to address his request for physical therapy. Regarding a second opinion, Dr. Posson found that Jones' primary care doctor had discussed Jones' case with other orthopedic surgeons and determined that they likely would not offer an improvement or better alternative to Jones' treatment plan with Dr. Zewert. Based on the medical records, Dr. Posson determined it was sufficient that Jones' medical condition would continue to be monitored and Jones would continue to receive care from his primary care physician.

Although Dr. Posson failed to grant Jones' inmate appeal seeking physical therapy and a second opinion, a reasonable jury could not find that he acted with deliberate indifference in doing so. Jones does not dispute that the medical records did not include any documentation by a primary care provider that physical therapy was medically indicated at the time Dr. Posson responded to the inmate appeal. *See* Docket No. 15-4 at 2-3. And Jones does not dispute that the medical records reviewed by Dr. Posson showed that the primary care provider had talked to other orthopedic

---

[6] Although Jones claims only that Dr. Posson denied physical therapy, the court also addresses the issue of a second opinion, as Dr. Posson's response to the inmate appeal also dealt with the request for a second opinion.

surgeons and concluded that a second opinion would not likely offer any better alternative to the current plan that Dr. Zewert had established. Only after reviewing Jones' medical records, Jones' interview with nurse Perry, and the fact that Jones would be discussing physical therapy with his doctor at his upcoming medical appointment did Dr. Posson determine that Jones should continue with his existing medical treatment plan. As a result of Dr. Posson's decision on the appeal, Jones continued to obtain treatment for his left finger. In other words, Dr. Posson did not increase or decrease the level of care Jones was receiving for his left finger.

As with the assertions against Dr. Lam, Jones' assertions against Dr. Posson show only a difference of opinion with Dr. Posson. *Sanchez*, 891 F.2d at 242. Jones provides no competent evidence that physical therapy or a second opinion was medically necessary and fails to show that Dr. Posson's actions were "medically unacceptable under the circumstances" or that Dr. Posson chose to "disregard an excessive risk" regarding Jones' left finger. *Toguchi*, 391 F.3d at 1058.

C.     <u>Dr. Zewert</u>

Jones alleges in his verified complaint that Dr. Zewert violated Jones' Eighth Amendment rights by ignoring notification from prison staff in late September 2017 that Jones' finger had become infected. Docket No. 1 at 8, 10. In his declaration, Jones states that Dr. Zewert "ignored" warnings about the infection on September 27, September 29, and October 7, 2017. Docket No. 18-1 at 14.

Having carefully reviewed the evidence, the court concludes that no reasonable jury could find that Dr. Zewert's response to Jones' left finger care needs amounted to deliberate indifference. It is undisputed that between August 18, 2017, and December 21, 2018, Dr. Zewert saw Jones for treatment eleven times, nine of which were follow-up appointments after the September 19, 2017, left finger surgery. Dr. Zewert also consulted via telephone with an E.R. doctor on October 7, 2017, regarding Jones' finger. In addition to monitoring and treating the complications that developed in Jones' left finger, Dr. Zewert provided further treatment options to Jones when the issues with his finger persisted.

Jones points to two specific ways in which he feels Dr. Zewert failed him. First, Jones alleges that Dr. Zewert failed to acknowledge a post-surgery infection. Jones' version of the facts is that Dr. Zewert "ignored" warnings on three occasions (i.e., September 27 and 29, and October 7, 2017) in a ten-day period that Jones' left finger might be infected. Docket No. 18-1 at 14-15. On this version of the facts, Jones does not avoid summary judgment because he presents no evidence that Dr. Zewert "ignoring" his possible infection caused any harm to him. Although it need not be substantial, some actual harm is necessary for a plaintiff to prevail on a deliberate indifference claim. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (subjective element of Eighth Amendment claim requires "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference"). Jones fails to provide any evidence that would enable a reasonable jury to conclude that he suffered harm as a result of Dr. Zewert's actions in this ten-day period. Jones does not dispute that, on two of these occasions (i.e., September 27 and October 7), he was under the care of medical care providers other than Dr. Zewert and was taking antibiotics during the ten-day time period, as the other health care providers had ordered antibiotics for him. Jones presents no evidence that some different or additional treatment beyond the antibiotics was medically appropriate during this time period. Moreover, Jones does not dispute that on the one day Dr. Zewert physically examined him (i.e., September 29), Dr. Zewert observed no physical signs of infection but nonetheless recommended that Jones continue with the antibiotics because of the risk of infection. Jones theorizes that his later skin graft was caused by Dr. Zewert ignoring a possible infection, but this speculation devoid of any evidentiary support is insufficient to defeat summary judgment. Jones provides no evidence to controvert the statement by Dr. Zewert's expert, Dr. Cohen, that any bacterial infection would not have caused additional harm to Jones because Jones would not have been able to regain mobility in his left finger after waiting so long after the injury to seek treatment. Docket No. 17-3 at 6-7. Even accepting Jones' version of the facts – that Dr. Zewert ignored the possible infection for this period – no reasonable trier of fact could find that Jones suffered any harm as a result.

The fact that there was or might have been an infection does not itself support an inference of deliberate indifference. Jones does not dispute the declaration by Dr. Cohen, that a bacterial infection can occur even in the absence of any negligence on the part of the medical provider. *Id.* at 6.

Jones also fails to present evidence that would allow a reasonable trier of fact to conclude that Dr. Zewert did not provide the proper care after he examined the finger in late September 2017. It is undisputed that Dr. Zewert continued to monitor Jones' finger and saw him at numerous appointments for wound care. Jones does not dispute that, when the E.R. doctor called Dr. Zewert on October 7, 2017, both the E.R. doctor and Dr. Zewert concluded there was no active, progressing infection and therefore no need to operate or prescribe more aggressive antibiotics. Jones does not dispute that, in later appointments, Dr. Zewert cleaned the wound, removed dead tissue from the wound, and instructed Jones how to care for the wound to prevent further contamination.

Second, Jones contends that Dr. Zewert's failure to provide him with physical therapy further contributed to the immobility and loss of feeling in Jones' left middle finger. Dr. Zewert declares that physical therapy would have been inappropriate and possibly damaging in the months following the surgery. There is no evidence that Jones would have been able to participate in physical therapy following a surgery where pins were in the wound for several weeks to stabilize it, significant necrosis developed, and a skin graft was necessary. The fact that Jones later received physical therapy after Dr. Zewert ended his care for Jones does not show that Dr. Zewert was deliberately indifferent in not recommending it while he was Jones' doctor, especially given that the physical therapy did not enable Jones to regain function in the left finger. *See* Docket No. 18-1 at 15 (describing his left finger as "crippled").

Jones also argues that Dr. Zewert was "not qualified and/or certified" to perform the finger surgery, pointing out that Dr. Zewert responded "no" to an interrogatory that asked: "Are you a State board certified orthopedic surgeon." Docket No. 18 at 2; Docket No. 18-1 at 2. The argument is meritless. As Dr. Zewert notes, there is no evidence that board certification is done at the state level and no evidence that only a board-certified orthopedic surgeon was qualified to operate on Jones' finger. Dr. Zewert also presents evidence that (a) he has performed many hundreds of hand

14

surgeries over his 17 years in private practice and (b) a physician who *is* board-certified by the American Board of Orthopaedic Surgery gave an expert opinion that Dr. Zewert's care and treatment of Jones' left finger was appropriate and met the applicable standard of care. Jones has not raised a triable issue that Dr. Zewert was not medically qualified to perform the finger surgery.

There is at best a difference of opinion between patient and doctor as to the proper course of care. Jones disagrees with the course of care pursued by Dr. Zewert, but completely fails to present any evidence that the course of care provided by Dr. Zewert was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to Jones' health. *See Toguchi*, 391 F.3d at 1058.

A physician is not required to be a guarantor of a patient's good health, regardless of whether the patient is in prison or at liberty. What the physician cannot do is be deliberately indifferent to an inmate's serious medical needs. Jones fails to present evidence that would allow a reasonable jury to find the defendants were deliberately indifferent to his left finger care needs. When the evidence is viewed in the light most favorable to Jones, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against Drs. Lam, Posson, or Zewert on his Eighth Amendment claims regarding his left finger care. Drs. Lam, Posson, and Zewert therefore are entitled to judgment as a matter of law on the Eighth Amendment claim.

## CONCLUSION

Defendants' motions for summary judgment are GRANTED. Docket Nos. 15, 16, 17. Defendants are entitled to judgment as a matter of law on plaintiff's claims. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: January 30, 2020

SUSAN ILLSTON
United States District Judge